**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE NYC BUS TOUR ANTITRUST LITIGATION<br><br>RELATED TO ALL CASES | Master Case No. 13-CV-0711 (ALC) (GWG)<br><br>ECF Case |

## ANSWER OF DEFENDANTS TWIN AMERICA, LLC, CITYSIGHTS LLC, AND CITY SIGHTS TWIN, LLC

Defendants Twin America, LLC, CitySights LLC, and City Sights Twin, LLC (collectively, "Twin America") answer the Complaint ("Complaint") of Plaintiff Natasha Bhandari ("Plaintiff") as follows. Plaintiff challenges the creation of Twin America, a 2009 joint venture that merged two double decker hop-on/hop-off tour operators in New York City, one of the world's top tourist destinations, attracting over 50 million visitors each year. Twin America tours are merely one of the many ways in which these tens of millions of visitors tour the city to see its many attractions. Twin America's tours attract less than 5% of the annual visitors to New York City. Contrary to Plaintiff's assertions, competition to provide tours is intense and includes not only other hop-on/hop-off bus tour companies in New York City, but a wide variety of additional tour services that visitors may purchase to see New York City's attractions.

Even within the improperly pled and unduly narrow market Plaintiff has attempted to allege, competition is robust. Other hop-on/hop-off bus tour companies that operate in the city or have publicized imminent entry include at least:

- Big Taxi;

- Circle Line's Metro Sightseeing;

- New York Water Taxi;

- NY SKYRIDE's Skyline Sightseeing; and

- Go New York Tours.

The ability of all of these companies to enter the business—as CitySights itself did from scratch in 2005—belies Plaintiff's allegations that there are significant barriers to entry. New entrants have demonstrated that they can obtain vehicles and can obtain bus stop authorizations for tours. Advertising revenue also helps offset the capital investments. A tour bus fleet, moreover, and its costs can scale with the growth of its ridership. The ability to succeed in the business depends on operating efficiently and providing first-rate service to compare favorably to the myriad other options available to New York City visitors.

In addition, Plaintiff's improperly pled and unduly narrow market allegations fail even to include the most obvious guided transportation tour competitors, such as OnBoard Tours and On Location Tours, which market directly against Twin America's tour services and have tour guides that accompany passengers to the attractions. Moreover, these types of competing transportation tours do not require any regulatory bus stop approval given the format of their service, and can load and unload passengers directly in front of any and all New York City attractions.

Contrary to Plaintiff's allegations, at no time has Twin America raised fare prices above competitive levels. The combination of the Coach USA and CitySights bus tour operations into Twin America enabled the merged company to compete more effectively by achieving cost savings, improving its service offerings, and expanding bus tours. Twin America was formed in early 2009, when the economy in New York City (as well as across the U.S. and around the world) was staggering from an unprecedented financial crisis that sent the economy into the worst tailspin since the Great Depression, coupled with fuel costs at or near historic highs. These

unprecedented and unforeseeable events and corresponding contraction in the demand for leisure

tours intensified pressure on companies like Coach USA and CitySights to contain expenses and

improve services.  The Twin America merger benefitted consumers by improving one of the

options available for tourists to see the sights of New York City.

## RESPONSE TO SPECIFIC ALLEGATIONS

1.      This case concerns an unlawful scheme orchestrated by Coach and City Sights, formerly the two main competitors in the market for "hop-on, hop-off bus tours in New York City, to fix prices in the market for "hop-on, hop-off" bus tours.  To provide cover for their plan to fix prices and eliminate competition, Coach and City Sights decided to engage in a purported joint venture, Twin America.  However, the improper purpose and effect of defendants' plan was to fix prices, a *per se* violation of the federal antitrust laws.

__ANSWER:__     Twin America admits that Coach and CitySights formed the Twin

America joint venture in 2009.  Twin America denies the remaining allegations in Paragraph 1.


2.      The record to date demonstrates--even prior to the taking of discovery--that the purpose and effect of the defendants' plan was to fix prices.
- Nine months before consummation, Coach proposed to its parent that an agreement with City Sights would allow both firms to "***increase fares by 10%***";
- Four months later, Coach explained to City Sights that an agreement between the two firms would permit "***flexibility regarding pricing***";
- One month before the alleged joint venture, Coach represented to its parent that without an agreement with City Sights, "competition" would make a price increase impossible;
- Shortly after the joint venture, defendants admittedly raised prices for City Sights by 10-17% to "***match***" fare increases by Coach implemented just prior to the parties' agreement; and
- Defendants maintained what the Surface Transportation Board has referred to as "***unchecked rate increases***" for years after the joint venture.
        Meanwhile, from the very outset, the agreement had no legitimate business purpose.  Rather, the agreement was simply an improper attempt to skirt the antitrust laws.

__ANSWER:__     Denied.


3.      Since entering the agreement and ceasing to compete nearly four years ago, defendants have successfully fixed the price of "hop-on, hop-off" bus tours in New York City at

10 to 17 percent above the previously prevailing market rate.  Defendants have been able to maintain these artificially inflated prices even in the face of reduced consumer demand due to the recession.

      **ANSWER:**    Denied.  Twin America avers that at no time has Twin America raised fare

prices above competitive levels.


      4.      Defendants' joint venture agreement has never been approved by state or federal regulators.  To the contrary, the Attorney General's Office of the State of New York immediately sought to investigate the formation of the joint venture.  Aware that their joint venture raised serious antitrust concerns, and with intent to subvert the government's inquiry, defendants temporarily staved off an antitrust investigation by belatedly applying to the Surface Transportation Board ("STB") for approval of the joint venture.  Even the STB noted its concern that its "***process may have been manipulated to avoid the [antitrust] inquiry***."  Ultimately, defendants' effort was unsuccessful, and federal and state regulators together recently filed a federal court antitrust action seeking to enjoin operation of the joint venture.

      **ANSWER:**    Twin America admits that the Attorney General's Office of the State of

New York has investigated the formation of Twin America.  Twin America admits that Twin

America filed an application with the STB on August 19, 2009.  Twin America admits that the

February 8, 2011 decision of the STB contains the select and incomplete quotation cited in

Paragraph 4.  Twin America admits that the United States and the State of New York have filed a

litigation captioned *United States of America, et al. v. Twin America, LLC, et al.*, No. 12 CV

8989, in the United States District Court for the Southern District of New York.  Twin America

denies the remaining allegations in Paragraph 4.


      5.      Defendants' conduct in connection with the Twin America transaction was price-fixing in clear violation of Section 1 of the Sherman Act.  By willfully acquiring and maintaining monopoly power in the hop-on, hop-off bus tour market through the same means, defendants also violated Section 2 of the Sherman Act.  Moreover, because the joint venture agreement also had the likely effect--and the express purpose--of substantially lessening competition and creating a monopoly, defendants violated Section 7 of the Clayton Act.  For the same reasons, defendants have also violated New York's Donnelly Act.

      **ANSWER:**    Denied.  Twin America avers that the Twin America transaction created

an integrative joint venture that benefitted consumers and that, in any event, could not have

constituted price-fixing.

6.     This action is instituted under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against defendants for the injuries sustained by plaintiff and the members of the Class by reasons of defendants' violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 7 of the Clayton Act, 15 U.S.C. § 18.  The action is also instituted under New York's Donnelly Act, N.Y. Gen. Bus. Law § 340, to recover treble damages and the costs of this suit, including reasonable attorneys' fees, for defendants' violations of that Act.

**ANSWER:**     Twin America admits that Plaintiff purports to bring this action under

Section 4 of the Clayton Act, 15 U.S.C. § 15 and New York's Donnelly Act, N.Y. Gen. Bus.

Law § 340, and that the action seeks to recover treble damages and the costs of this suit,

including reasonable attorney's fees.  Twin America denies the remaining allegations in

Paragraph 6.  Twin America specifically denies that any factual or legal basis exists for any of

the claims against Defendants in this action or that Plaintiff is entitled to any relief whatsoever.

7.     The Court has subject-matter jurisdiction over this case pursuant to 28 §§ 1331 and 1337.  The Court also has supplemental jurisdiction over plaintiff's Donnelly Act claim pursuant to 28 U.S.C. § 1367(a).

**ANSWER:**     Twin America admits the Court has original subject matter jurisdiction

and supplementary jurisdiction over the statutory claims Plaintiff has alleged.  Twin America

denies the remaining allegations in Paragraph 7.

8.     The Court has personal jurisdiction over each defendant and venue is proper in this district pursuant to Sections 4 and 12, of the Clayton Act, 15 U.S.C. §§ 15, 22, because, during the Class Period (defined below), each defendant resided in, was found in, had an agent in, and/or transacted business in the district.

**ANSWER:**     Twin America admits that the Court has personal jurisdiction over Twin

America under one or more of the statutes listed in this Paragraph.  Twin America admits that

venue is proper under one or more of the statutes listed in this Paragraph.  Twin America admits

that it transacts business within the Southern District of New York.  Twin America denies the

remaining allegations in Paragraph 8.  Twin America specifically denies that any factual or legal

basis exists for any of the claims against Defendants or that Plaintiff is entitled to any relief

whatsoever.


      9.     Plaintiff Natasha Bhandari is a citizen and resident of Pleasantville, New York.
Ms. Bhandari directly purchased tickets for hop-on, hop-off bus tours of New York City from
one or more defendants and was overcharged for her purchase due to the acts alleged in this
complaint.

      **ANSWER:**   Twin America denies the allegation in Paragraph 9 that Ms. Bhandari was

"overcharged for her purchase due to the acts alleged in this complaint."  Twin America lacks

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

in Paragraph 9 and on this basis denies those allegations.


      10.    Coach USA, Inc. is a Delaware corporation with its principal place of business in
Paramus, New Jersey.  Coach is a wholly-owned subsidiary of Stagecoach Group plc
("Stagecoach"), an international transportation company based in the United Kingdom and
registered in Perth, Scotland.  Coach controls numerous American motor passenger carriers,
including airport shuttles in the New York City area and the discount express bus service
Megabus.com.  Coach operated hop-on, hop-off bus tours in New York City under the Gray Line
brand, which the company licensed for use in New York City from Gray Line Worldwide, an
entity unaffiliated with Stagecoach.

      **ANSWER:**   Paragraph 10 is directed to another defendant.  Twin America lacks

knowledge or information sufficient to form a belief as to the truth of the allegations in

Paragraph 10 and on this basis denies those allegations.

11.     International Bus Services, Inc. ("IBS") is a New York corporation with its principal place of business in Hoboken, New Jersey.  The company is a wholly-owned subsidiary of Coach USA, and acts as one of its motor passenger carriers, with a focus on the New York/New Jersey area.

        **ANSWER:**     Upon information and belief, Twin America admits that IBS is a New York corporation and a wholly-owned subsidiary of Coach USA, Inc.  Twin America admits that IBS provided motor passenger carrier service in the New York City area prior to the formation of the Twin America joint venture.  Twin America lacks knowledge or information sufficient to form a belief as to any remaining allegations in Paragraph 11 and on this basis denies those allegations.

12.     CitySights is a New York limited liability company with its principal place of business in New York, New York.  CitySights operated hop-on, hop-off bus tours in New York City under the CitySights NY brand.

        **ANSWER:**     Twin America admits the allegations in Paragraph 12.

13.     City Sights Twin is a New York limited liability company with its principal place of business in New York, New York.  The company was formed for the sole purpose of owning an interest in Twin America.

        **ANSWER:**     Twin America admits the allegations in Paragraph 13.

14.     Twin America is a Delaware limited liability company with its principal place of business in New York, New York.  Twin America was established pursuant to an agreement executed on March 17, 2009 between IBS and City Sights Twin (the "Transaction").  Pursuant to the Transaction, Coach (through IBS) and City Sights (through City Sights Twin) contributed all of their New York City hop-on, hop-off bus tour operations and assets to Twin America; acquired a 60 percent and 40 percent membership interest in Twin America, respectively; and divided management control of Twin America.  The agreement includes a non-compete provision whereby Coach and City Sights agreed not to compete in the hop-on, hop-off bus tour business within 25 miles of New York City.  Twin America operates hop-on, hop-off bus tours under both the Gray Line New York and CitySights NY brands.

        **ANSWER:**     Twin America admits that it is a Delaware limited liability company with

its principal place of business in New York, New York.  Twin America admits that it was

established pursuant to a joint venture agreement executed on March 17, 2009 between IBS and

City Sights Twin, LLC.  Twin America admits that pursuant to the joint venture agreement:  (1)

Coach (through IBS) and CitySights (through City Sights Twin, LLC) contributed assets,

including their New York City hop-on/hop-off bus tour operations under the Gray Line New

York and CitySights NY brands, respectively, to the joint venture; (2) Coach obtained a 60%

economic interest in the joint venture, and CitySights obtained a 40% economic interest; (3)

Coach and CitySights divided management power over Material Decisions (as defined in the

joint venture agreement); and (4) Mark Marmurstein was appointed President of Twin America

and given control over day-to-day operations.  Twin America further admits that the joint

venture agreement includes a clause prohibiting the parties from competing for the duration of

the joint venture, or 5 years following a party's exit from the joint venture, in "the marketing,

sale and conduct of a sightseeing 'hop-on/hop-off' tour or escorted group on a per capita basis

business primarily by double-decker buses, trolleys and motor coaches" within twenty-five miles

of New York City.  Twin America denies the remaining allegations in Paragraph 14.


     15.    Hop-on, hop-off bus tours visit New York City's leading attractions while
allowing customers to tailor their itineraries to the places that interest them.  As the bus travels a
fixed route, a professional tour guide provides information about the attractions and the city.
Customers may "hop off" the bus at any of the stops to further explore particular attractions and
then "hop on" another bus to continue on the tour route using the same ticket.  Tickets range
from one to four days of validity.

     **ANSWER:**    Twin America admits that Twin America hop-on/hop-off bus tours travel

on fixed routes while a professional tour guide (or audio guide) provides information about the

attractions and the city.  Twin America further admits that riders can "hop off" the bus at any of

the stops to further explore particular attractions and later "hop on" another bus to continue along

the tour route using the same ticket.  Twin America admits its tickets range in various days of

validity.  Twin America denies the remaining allegations in Paragraph 15.  Twin America avers

that there are many other options to see New York City attractions.  *See* TripAdvisor, *New York*

*City - Sightseeing Tours*, http://www.tripadvisor.com/Attractions-g60763-Activities-c42-

New_York_City_New_York.html#TtD (last visited May 12, 2013).


16.     The routes offered by hop-on, hop-off bus tour providers stop at many of New
York City's leading attractions, including Times Square, the Empire State Building, the World
Trade Center site, Battery Park, Rockefeller Center, Central Park, and the United Nations, as
well as popular neighborhoods such as Chinatown, Greenwich Village, Little Italy, SoHo, and
the Upper East Side.  Hop-on, hop-off bus tour providers typically operate separate "downtown"
and "uptown" routes, but offer customers the ability to purchase an all-routes ticket that includes
both.

**ANSWER:**     Twin America admits that Twin America has bus stops at or near Times

Square, the Empire State Building, the World Trade Center site, Battery Park, Rockefeller

Center, Central Park, and the United Nations, as well as popular neighborhoods such as

Chinatown, Greenwich Village, Little Italy, SoHo, and the Upper East Side.  Twin America

admits that it provides hop-on/hop-off bus tours around different routes (called "loops"),

including an option to purchase an "all loops" ticket.  Twin America denies the remaining

allegations in Paragraph 16.  Twin America avers that visitors have many other options for

visiting these same attractions and areas of interest.


17.     Hop-on, hop-off bus tour businesses in New York City must operate large
numbers of buses in order to succeed.  A customer who "hops off" a bus to visit an attraction and
then decides to "hop on" again and resume the tour will expect to wait no more than ten or
fifteen minutes for another bus to arrive.  Indeed, excessive wait times are one of the most
frequent customer complaints received by hop-on, hop-off bus tour operators.  In order to ensure
minimum wait times for customers, a hop-on, hop-off bus tour business must secure permits
from the New York City Department of Transportation ("NYCDOT") to create a large network
of convenient--and legal--pick-up and drop-off locations where new customers can also purchase
tickets and begin their tours.

**ANSWER:**   Denied.  For example, the Complaint avers in paragraph 21 that Big Taxi Tours has operated a hop-on/hop-off bus tour since 1999 with "a handful of buses."

18.     Hop-on, hop-off bus tours providers in New York City currently offer their tours on open-top double-decker buses.  The open-air upper deck provides customers with the ability to observe New York City from an elevated vantage point and to enjoy unobstructed views that are not available through other means of grand transportation or on foot.

**ANSWER:**   Twin America admits that certain hop-on/hop-off bus tour providers in New York City currently offer their tours on open-top, double-decker buses.  Twin America denies the remaining allegations in Paragraph 18.

19.     Although a wide array of tourism offerings are available in New York City, a significant number of visitors specifically demand hop-on, hop-off bus tours and are unlikely to substitute other sightseeing experiences in response to a small but significant and non-transitory price increase.  No water, air, or other ground-based tourism product or service offers a reasonably interchangeable consumer experience to hop-on, hop-off bus tours.  For example, hop-on, hop-off water tours cannot provide access to many of New York City's leading attractions because they are inland.  Bike and walking tours do not cover the same range of attractions or provide similar coverage in such a short period of time.  Bus tours with a fixed itinerary and duration do not afford consumers the same flexibility to tailor their itineraries to the places that interest them.

**ANSWER:**   Denied.

20.     Providers of water, air, and other types of ground tours do not view themselves to be in direct competition with hop-on, hop-off bus tours and determine their prices and service offerings largely independently of the prices and service offerings of hop-on, hop-off bus tour providers.  In fact, Coach and City Sights have long marketed many of the tours offered by these other providers in combination with their own hop-on, hop-off bus tours, indicating that defendants do not view these services as close competitors to or substitutes for their hop-on, hop-off bus tours, and instead view them as complements to their services.

**ANSWER:**   Twin America admits that it sells tour packages that include other tour services and attractions.  Twin America denies the remaining allegations in Paragraph 20.  Twin America further avers that many other services expressly advertise, market, and view themselves

as competing directly against Twin America's hop-on/hop-off bus tour services.  For example,

OnBoard Tours, a provider of guided shuttle tours, describes on its website the top reason to

choose its tours over other New York City tours:

> Hop On, Hop Off Tours are great - if you don't mind waiting in line for the next bus to come hoping there will be a seat available for you or that it doesn't start pouring rain.  And what about navigating a new city?  What happens when you get lost, or you really want to know the history behind that gorgeous old building with the fountain in the courtyard?  OnBoard Tours give you peace of mind - not only are you assured a seat on one of our climate-controlled shuttles (we'll talk more about how great our shuttles are later) - but you're also guaranteed a guide who will be with you every step of the way.  That's right!  Our guides actually hop off with you to give you the real history of NYC.  It's like two tours in one - a walking tour and a bus tour of the city that never sleeps.

*See* On Board Tours, *Top 5 Reasons To Choose On Board Tours*,

http://newyorktour.onboardtours.com/reports/top5reasons.pdf (last visited May 12, 2013).

On Location Tours, a provider of guided bus tours, also advertises its tours in direct

competition with Twin America:

> Our New York City tours provide a front row seat to the best NYC landmarks; from the Empire State Building to Times Square to Central Park to Grand Central Station. . .
>
> We may not have Ducks or Double Deckers, but we do have Carrie Bradshaw, Tony Soprano, Blair Waldorf and we'll take you to where everybody knows your name!

*See* On Location Tours, http://www.screentours.com (last visited May 12, 2013).

Real New York Tours, a top-rated provider of walking tours, advertises its tours as better

than hop-on/hop-off bus tours:

> Lets face it, New York tours are only as good as their tour guides. Real New York Tours gives people the opportunity to see the city through the eyes of real New Yorkers.  Real New York Tours explores the history, the cracks and crevices, the side streets, and culture of real New York City neighborhoods.  No double decker buses or sitting in a traffic jam.  We'll ride the New York subway,

> pound the pavement, and meet the people who have become the
> fabric of this great city.  Together we will feel the electricity that
> drives everyday New Yorkers.

*See* Real New York Tours, http://realnewyorktours.com (last visited May 12, 2013).

21.     Coach acquired the Gray Line New York hop-on, hop-off bus tour business in
1998.  At that time, Coach and New York Apple Tours ("Apple Tours") were the primary
providers of hop-on, hop-off bus tours in New York City.  A small, family-run company, Big
Taxi Tours, entered in 1999, but it operated only a handful of buses and held (and continues to
hold) approximately 1 percent of the market.  In 2000, Coach acquired many of Apple Tours's
assets and employees after Apple Tours was forced out of business due to safety and traffic
violations, leaving Coach as the only significant operator and allowing it to turn substantial
profits.

**ANSWER:**     To the extent the allegations in Paragraph 21 are directed to another

defendant, Twin America lacks knowledge or information sufficient to form a belief as to the

truth of those allegations and on this basis denies those allegations.  Twin America denies the

remaining allegations in Paragraph 21, and avers that Plaintiff's allegations in Paragraph 21 fail

to include or mention other hop-on/hop-off bus tour providers that have operated in New York

City.

22.     In 2005, Coach's market dominance came under attack with the entry of City
Sights into the hop-on, hop-off bus tour market.  City Sights was founded by an existing New
York City tourism firm with years of experience primarily managing airport transportation
businesses.

**ANSWER:**     Twin America admits that CitySights commenced operations in 2005.

Twin America admits CitySights was founded by Mark Marmurstein, who had substantial

experience in the airport transportation business.  Twin America avers that, prior to forming

CitySights, Mr. Marmurstein had no experience operating sightseeing tours.  Twin America

denies the remaining allegations in Paragraph 22.

23.     Before City Sights could begin operating its hop-on, hop-off bus tours, it had to obtain authorization from NYCDOT to pick up and drop off passengers at specified bus stops. Based on congestion and traffic patterns that prevailed at the time, NYCDOT granted City Sights more than 40 bus stops for its hop-on, hop-off bus tours.  The approved stops covered New York City's top tourist attractions including Times Square, the Empire State Building, the World Trade Center site, Battery Park, Rockefeller Center, Central Park, and the United Nations, as well as the city's most popular neighborhoods.  City Sights's approved stops were typically located directly in front of the attractions and enabled City Sights to offer tour routes comparable to those offered by Coach.

**ANSWER:**    Twin America admits that City Sights obtained approval in 2005 from

NYCDOT for more than 40 hop-on/hop-off bus stops that included stops near Times Square, the

Empire State Building, the World Trade Center site, Battery Park, Rockefeller Center, Central

Park, and other attractions.  Twin America denies the remaining allegations in Paragraph 23.

Twin America avers that NYCDOT assigned CitySights significantly fewer bus stops than

CitySights requested.  These stops were located adjacent to or within the vicinity of the

attractions, but not directly in front of those attractions.  These facts did not limit CitySights'

ability to operate a hop-on/hop-off bus tour in New York City.  The location of CitySights stops

at that time differed from Gray Line's stops, and CitySights formulated routes around the stops it

received.

24.     With key bus stops in hand, City Sights commenced operations and embarked upon a number of strategies to expand its business, establish brand recognition, and challenge Coach.  City Sights competed on price, charging base fares at or slightly below Coach's rates, and its street sellers--the largest sales distribution channel for hop-on, hop-off bus tours--could request authorization from City Sights managers to offer on-the-spot discounts as conditions warranted.  City Sights developed novel service offerings, such as packages that included boat tours offered by another company.  Additionally, City Sights partnered with New York City's largest hotel concierge service, Continental Guest Services ("CGS") to sell tickets in CGS's hotels and offer hotel guests special promotions.  City Sights established an array of joint marketing arrangements similar to Coach's, enabling City Sights to sell its hop-on, hop-off bus tours along with other tourism services from third-party providers at a reduced combined ticket price.

**ANSWER:**    Twin America admits that CitySights began operations in 2005 with eight

double-decker buses and grew to 62 double-decker buses by March 2009. Twin America admits that CitySights started its business with prices at or near Coach's prices for similar tours. Twin America further admits that CitySights street ticket sellers, which were the largest distribution channel for CitySights' bus tour sales (and remain the largest distribution channel for Twin America), could request, and still can request, authorization for discounts as conditions warrant. Twin America admits CitySights offered a bundled boat tour in conjunction with certain ticket packages, and still does, and that CitySights entered into agreements with other tour operators to offer bundled packages at reduced prices, as did Coach. Twin America continues to enter into agreements with other tour operators to offer bundled packages at reduced prices. Twin America denies the remaining allegations in Paragraph 24, and specifically denies that CitySights partnered with CGS when it started. Twin America avers that CGS did not sell CitySights tickets until 2007.

25.     In the years following its entry into the hop-on, hop-off bus tour market, City Sights purchased more buses, increasing its capacity and decreasing customer wait times. City Sights's fleet grew from eight buses in May 2005, to approximately 34 buses in 2007, to more than 50 buses by the end of 2008, and to 62 buses by March 2009. This larger fleet gave City Sights the size and scale to rival Coach's fleet of over 70 double-decker buses.

**ANSWER:**     Twin America admits that CitySights started with eight double-decker buses in 2005, and grew to 17 double-decker buses by the end of 2006. By the end of 2007, CitySights had expanded its fleet to 29 double-deckers, and by the end of 2008, CitySights was operating 54 double-deckers. CitySights was operating 62 double-decker buses by the time of the joint venture. Twin America denies the remaining allegations in Paragraph 25. Twin America avers that CitySights expanded the size of its fleet as ridership expanded. Twin America avers that any bus tour provider can expand its fleet as ridership increases, and that it can compete efficiently at any point in the development of its business, as CitySights did at all

14

stages of its growth and history.

26.     City Sights's steady growth did not go unnoticed at Coach, and as City Sights ate into its rival's market share, Coach's focus on City Sights intensified.  Coach monitored City Sights's fleet size and service offerings, dispatched "secret shoppers" to ride City Sights buses to gather intelligence on City Sights's service and promotions, and stationed employees on New York City's sidewalks to track City Sights passenger volume.  Coach also commissioned an independent market survey to "determine what impact our main competitor City Sights is having" and engaged a marketing firm to review City Sights's successful online advertising efforts and improve its own efforts in response.

**ANSWER:**     Paragraph 26 is directed to another defendant.  Twin America lacks

knowledge or information sufficient to form a belief as to the truth of the allegations in

Paragraph 26 and on this basis denies those allegations.

27.     Coach's extensive monitoring of City Sights's expanding operations reached the highest levels of the company and its corporate parent, Stagecoach.  Coach's President, Dale Moser, who oversees approximately two dozen Coach businesses operating across the United States, personally spent hours on New York City street corners tracking City Sights's activities, reporting directly to Stagecoach CEO Brian Souter on the frequency of City Sights buses, and conducting Internet search queries at Souter's request to determine the relative placement of the Coach and City Sights websites in response to term searches

**ANSWER:**     Paragraph 27 is directed to another defendant.  Twin America lacks

knowledge or information sufficient to form a belief as to the truth of the allegations in

Paragraph 27 and on this basis denies those allegation.

28.     Coach routinely responded to City Sights's promotions by matching deals or reconsidering its own offerings.  For example, in February 2008, Coach matched a buy-one-get-one-free promotion initiated by City Sights.  Coach also created a comparable water tour package in response to City Sight's inclusion of a free boat tour.

**ANSWER:**     Twin America admits that, around February 2008, CitySights offered a

buy-one-get-one-free promotion.  The remaining allegations in Paragraph 28 are directed to

another defendant.  Twin America lacks knowledge or information sufficient to form a belief as

to the truth of those allegations and on this basis denies those allegations.

29.     The head-to-head competition between City Sights and Coach led to numerous disputes.  For example, in August 2007, City Sights threatened to sue Coach, alleging that Coach had "engaged in a concerted series of actions" to force City Sights to "sell or terminate [its] business."  In a draft complaint City Sights transmitted to Coach, City Sights accused Coach of monopolization and other antitrust law violations, specifically alleging that Gray Line "maintain[ed] market power, monopoly power and otherwise dominate[d] the relevant market." City Sights defined the relevant market as the "Double Decker, Hop-on, Hop-off Bus Tours Market" and identified Coach and City Sights as the only current competitors in the market.  City Sights did not ultimately file the lawsuit, and City Sights and Coach continued their fierce head-to-head competition.

**ANSWER:**     Twin America admits that attorneys for CitySights drafted and transmitted to Coach a draft complaint that includes the quotations selectively cited in Paragraph 29.  Twin America admits that CitySights never authorized its lawyers to file this lawsuit.  Twin America denies the remaining allegations in Paragraph 29.

30.     By mid-2008, Coach was citing City Sights's growth to help explain Gray Line's diminished financial performance in regular reports produced for Stagecoach.  Stagecoach CEO Brian Souter had grown tired of the relentless competition with City Sights, with the two companies matching each other's every move.  Souter no longer wanted to have City Sights as an "enemy" and instead sought to join forces.  Accordingly, at the end of May 2008, Souter directed Coach's management to initiate discussions with City Sights toward the express goal of ending competition and fixing hop-on, hop-off bus tour prices above the market rate.  Starting in June 2008, Souter traveled to New York City to meet with City Sights's President, Mark Marmurstein.

**ANSWER:**     Twin America admits that Mark Marmurstein, the President of CitySights, met with Brian Souter, the CEO of Stagecoach, in New York City in June 2008 to discuss a possible business collaboration.  The remaining allegations in Paragraph 30 are directed to another defendant.  Twin America lacks knowledge or information sufficient to form a belief as to the truth of those allegations and on this basis denies those allegations.

31.     With Marmurstein reluctant to exit his successful hop-on, hop-off bus tour business, Coach and City Sights began discussing the possibility of a joint venture.  In a proposal that Coach transmitted to City Sights in September 2008, Coach made it clear that the basic purpose of such a joint venture would be anticompetitive in nature.  Indeed, Coach expressly stated in the proposal that the  benefits of the combination would include "easier decision making as the sole player in [the] 'double deck' market," and "flexibility regarding pricing."

**ANSWER:**     Twin America admits that in 2008 Coach and CitySights began discussing the possibility of a joint venture.  Twin America further admits that Coach provided CitySights with a document that included the quotations selectively cited in Paragraph 31.  Twin America denies the remaining allegations in Paragraph 31.  Twin America avers that the document containing the quotations selectively cited in Paragraph 31 also discussed efficiencies the joint venture would produce, including allowing the combined company to better weather rising costs and to continue to efficiently compete in the face of new and threatened competition.


32.     After approximately six months of negotiations, the parties agreed to a combination that would make Marmurstein president of the combined entity, evenly split management rights, and divide profits 60 percent to 40 percent in Coach's favor.  The parties eventually executed the Transaction forming Twin America on March 17, 2009.

**ANSWER:**     Twin America admits that IBS and City Sights Twin, LLC executed a joint venture agreement on March 17, 2009.  Twin America admits that pursuant to the joint venture agreement:  (1) Coach (through IBS) and CitySights (through City Sights Twin, LLC) contributed assets, including their New York City hop-on/hop-off bus tour operations under the Gray Line New York and CitySights NY brands, respectively, to the joint venture; (2) Coach obtained a 60% economic interest in the joint venture, and CitySights obtained a 40% economic interest; (3) Coach and CitySights equally divided management power over Material Decisions (as defined in the joint venture agreement); and (4) Mark Marmurstein was appointed President of Twin America and given control over day-to-day operations.  Twin America denies the remaining allegations in Paragraph 32.  Twin America avers that the transaction was wholly

uncertain prior to signing, in part because the core issue of control over the day-to-day operations was not resolved until near the time of signing.

33.    The underlying anticompetitive purpose of the joint venture was clear from the very start of Coach's negotiations with City Sights.  In a July 2008 presentation to Stagecoach CEO Brian Souter, Coach executives explained that one of the "City Sights Options" was to "[i]ntegrate with Gray Line and increase fares by 10% on combined business."  As negotiations with City Sights deepened in the fall of 2008, Coach incorporated a 10 percent fare increase into its internal projections of the deal, and shared analyses with City Sights that focused on the 10 percent fare increase assumption.  City Sights, for its part, developed its own hopeful internal projection of the millions of dollars the 10 percent fare increase would yield, and shared and discussed this analysis with Coach.

**ANSWER:**    Twin America admits that certain financial projections Coach provided to

CitySights during negotiations contained information based on a 10% fare increase.  Twin

America admits CitySights prepared certain internal analysis based on Coach's financial

projections for purposes of negotiations with Coach.  The remaining allegations in Paragraph 33

are directed to another defendant.  Twin America lacks knowledge or information sufficient to

form a belief as to the truth of those allegations and on this basis denies those allegations.  Twin

America avers that at the time the joint venture negotiations were occurring, the U.S. price of oil

spiked at an all-time historic high of $145.29 per barrel.  BBC News, *Oil Price Hits Yet Another*

*Record*, http://news.bbc.co.uk/2/hi/7486764.stm (last visited May 12, 2013).  These

unprecedented fuel costs caused marketplace reactions by businesses impacted by these suddenly

exponential cost spikes.  New York City, for example, imposed a 20% surcharge on taxi cab

fares, and the prices of tours and attractions across New York City increased beginning in 2009.

For example, Circle Line, a boat tour provider, increased its rates on different tours by 12.9%

and 21.1% between 2008 and 2010.  New York Water Taxi increased fares by 25%.  And the

Harlem Gospel bus tour increased fares by 10%.  Likewise, sightseeing attractions were raising

rates at this time (*e.g.*, Museum of the City of New York (42%); Madame Tussauds (22%); UN

Tour (18%)).  Twin America further avers and specifically denies that the joint venture was in any way designed to increase prices.  Coach in fact had already changed prices on certain Gray Line tours in 2008 and in February 2009, prior to the Twin America transaction, through fuel surcharges and adjustments to certain listed fares.

34.    By December 2008, the plan to jointly raise prices by 10 percent was firmly established as the essential driver of the deal.  An internal summary of the joint venture's terms transmitted from Coach to Stagecoach, for example, explained that the "[o]verall strategy is to integrate both businesses[,] drive out synergies and implement a fare increase of approximately 10%."  The price increase was central to Coach's February 2009 presentation to Stagecoach's board seeking approval for the Transaction.  A Coach executive advised the Stagecoach board that the key "benefits of combining businesses" was "[i]mproved profitability," which was driven, in part, by "assum[ing] [a] 10% fare increase."  The presentation explained that without the Transaction, there was no opportunity to implement a fare increase "due to competition."

**ANSWER:**    Twin America denies the allegations in Paragraph 34 that are directed to another defendant, on the basis that Twin America lacks knowledge or information sufficient to form a belief as to the truth of those allegations.  Twin America denies any and all remaining allegations in Paragraph 34.

35.    There was no other legitimate, non-pretextual justifications underlying defendants' decision to enter into the joint venture agreement.  It was simply the mechanism by which to eliminate competition and increase prices, which they could not do absent an agreement between Coach and City Sights.  As noted by the STB in its decision denying approval to defendants' venture, "the elimination of a close competitor appears to have ended the market constraints that preventing City Sights from raising its prices without fear of a market response. After the transaction, Twin America was free to decide to raise its prices."  This was precisely defendants' plan.

**ANSWER:**    Twin America admits the STB's February 8, 2011 decision contains the select and incomplete quotation cited in Paragraph 35.  Twin America denies the remaining allegations in Paragraph 35.

36.     Consistent with defendants' projections, in early 2009, over a period of approximately two months, defendants implemented the joint venture and began their successful effort to fix prices substantially above the market rate.  On February 5, 2009, at a time when Coach and City Sights were exchanging drafts of the joint venture agreement, Coach announced a fare increase of $5 for its Gray Line tours--roughly 10 percent of the price of Gray Line's most popular tour, the All Loops Tour, which increased from $49 to $54.  City Sights did not immediately match and the temporary fare disparity caused customers to flock to CitySights.  Although Coach executives noted internally that the increase had resulted in "resistance to the higher price and customer shift to [City Sights]," the implications of this shift would be fleeting as the formation of Twin America would extend the price increase to City Sights and combine the two companies' profits.  On March 17, 2009, Coach and City Sights executed the joint venture agreement.  And on April 14, 2009, Twin America increased base fares for City Sights tickets by the same $5 amount.  In the course of the proceedings before the STB, Twin America's counsel conceded that City Sights's prices were increased in order to "match" the fares of Gray Line.

**ANSWER:**     Twin America admits that Coach changed prices in 2008 and in February 2009 on certain tours.  Twin America admits that it increased fares on certain CitySights tours in April 2009.  Twin America denies the remaining allegations in Paragraph 36.  Twin America avers that, at the time the joint venture negotiations were occurring, the price of oil spiked at an all-time high and that other tours and sightseeing attractions in New York City were raising their rates.  Twin America incorporates by reference its response to Paragraph 33 as though fully set forth herein.

37.     The 2009 price increase is significant when compared to Gray Line's historical price changes for the 18 month period between February 2007 and August 2008.  During that period, Gray Line had increased its fares twice with a range of just 1 to 3 percent.  Defendants' significant price increases in the period surrounding the Twin America deal are also noteworthy because they were executed in the face of difficult market conditions of declining demand caused in part by the worldwide economic crisis.  Between 2001 and 2011, New York City experienced an increase of approximately two million visitors every year (compared to the prior year), *except for 2009*.  In 2009, 1.3 million *fewer* visitors came to New York City (compared to 2008), the only decline in visitors during that decade.  Similarly, between 2003 and 2011, direct visitor spending in New York City increased every year by approximately $2 billion per year, *except for 2009*, during which New York City experienced a decline of $3.8 billion in direct visitor spending.  Absent defendants' price-fixing conspiracy, economics would suggest that lower demand would lead to price reductions--not the 10 percent and greater price increases that defendants profitably implemented.

**ANSWER:**   Twin America admits that Coach changed its prices on certain Gray Line tours in 2008.  Twin America lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 37 and on this basis denies those allegations.  Twin America specifically denies the existence of any price-fixing conspiracy as alleged in the final sentence of Paragraph 37.

38.     Twin America has sustained the price increase for both Gray Line and City Sights tours in the more than three years since its implementation. The parties have continued to maintain both the Gray Line and CitySights NY brands in part because, as Coach explained to City Sights, "[p]olitically and competitively keeping both brands keeps the competition at bay as they continue to see two suppliers of tour services in the market and [the] City maintains the same understanding." In other words, defendants have maintained these two separate brands for the express purpose of avoiding the appearance of an unlawful conspiracy to fix prices above the market rate.

**ANSWER:**   Twin America admits that CitySights received a document from Coach containing the quotation selectively cited in Paragraph 38.  Twin America denies the remaining allegations in Paragraph 38.

39.     Under federal law, parties engaging in a transaction involving change in control of an interstate motor carrier must apply for approval from the STB prior to carrying out the transaction.  If the STB concludes that the proposed transaction is consistent with the public interest, the transaction becomes exempt from the antitrust laws.

**ANSWER:**   Twin America submits that Paragraph 39 contains legal conclusions that do not require a response, and on that basis denies these allegations.  Twin America avers that it was required by law to file an application for approval of the joint venture with the STB.

40.     On March 31, 2009, Coach and City Sights began operating Twin America without first seeking STB approval.  In late July and early August 2009, the parties received subpoenas from the Antitrust Bureau of the New York State Attorney General's Office seeking information concerning the formation and operation of Twin America.  Almost immediately

thereafter, Coach and City Sights sought STB approval for the joint venture, claiming that Twin America's operations were interstate in nature and therefore subject to STB jurisdiction.

**ANSWER:**   Twin America admits that Coach and CitySights began operating Twin America on March 31, 2009.  Twin America admits that Twin America and CitySights each received a Subpoena Duces Tecum from the NYSAG on or about August 3, 2009, concerning the formation of Twin America.  Twin America admits that it filed its STB application on August 19, 2009.  Twin America denies the remaining allegations in Paragraph 40.  Twin America specifically denies that Twin America filed for STB approval because it had received subpoenas from the NYSAG or that its STB application was a manipulation of the STB process or an attempt to avoid the NYSAG's investigation of the merger.  To the contrary, Twin America avers that Twin America had begun preparing its STB application prior to learning of the NYSAG investigation.

41.     Coach and City Sights initially proceeded as if Twin America's services were subject only to local jurisdiction.  They subsequently engaged the federal licensing process by filing their application with the STB, but not until four months after the joint venture was actually formed.  The trigger for their federal filing was the New York State Attorney General's service of subpoenas on Coach and City Sights concerning the antitrust implications of Twin America's formation and operation.

**ANSWER:**   Denied.  Twin America further incorporates its averments in Paragraph 40 as though fully set forth herein.

42.     Indeed, in their efforts to avoid the State's antitrust inquiry, Coach and City Sights went as far as to modify the transaction to include interstate transportation, thereby raising the likelihood that the transaction would come within the scope of the Board's jurisdiction.

**ANSWER:**   Denied.  Twin America further incorporates its averments in Paragraph 40 as though fully set forth herein.

43.     Although the STB was "concerned that the [STB's] processes may have been manipulated to avoid the [antitrust] inquiry," the STB undertook to analyze the joint venture under its "public interest" standard to determine "whether the transaction is likely to have anticompetitive consequences that would negatively impact the public."

**ANSWER:**     Twin America admits that the STB's February 8, 2011 decision contains the quotations selectively cited in Paragraph 43.  Twin America denies the remaining allegations in Paragraph 43.

44.     In February 2011, the STB rejected the parties' application, concluding that the formation of Twin America yielded "a combined entity that possesses excessive market power and has the ability to raise rates without competitive restraint and otherwise conduct its operations to the detriment of consumers."  The STB concluded, among other things, that "the relevant market in which the Applicants compete is double-decker, hop-on, hop-off bus tours in NYC"; that "[a]fter the transaction, Twin America was free to decide to raise its prices--a hallmark of unrestrained market power"; that the transaction resulted in "unchecked rate increases"; that the Board "ha[d] not seen the public benefits that Applicants argue are the result of the joint venture"; and that the parties "ha[d] not satisfied their burden of demonstrating that barriers to entry are sufficiently low to discipline Applicants' conduct."  Accordingly, the STB ordered Coach and City Sights to either dissolve Twin America or cease the limited interstate service that the STB found to be the basis for its jurisdiction.

**ANSWER:**     Twin America admits that on February 8, 2011, the STB denied Twin America's application.  Twin America admits that the STB's February 8, 2011 decision contains the quotations selectively cited in Paragraph 44.  Twin America admits that the STB ordered Coach and CitySights to either dissolve Twin America or cease the interstate service that the STB found to be the basis for its jurisdiction.  Twin America denies the remaining allegations in Paragraph 44.

45.     Further, as noted by the STB, the 2009 fare increases of 10 to 17 percent--completed after the formation of Twin America--were put in place during a period of depressed passenger demand and when fuel prices were dropping.

**ANSWER:**     Denied.  Twin America further incorporates its averments in Paragraph 33 as though fully set forth herein.

46.     Coach and City Sights requested reconsideration of the STB's order.  In January 2012, the STB denied reconsideration, affirming that "[a]fter unlawfully consummating a joint venture without the required approval, Applicants belatedly sought Board authorization for a transaction that created an entity that dominates the market in which it competes and has the ability to raise rates or reduce service without sufficient competitive restraints."  Defendants than chose to terminate their limited interstate service and withdraw from STB jurisdiction rather than dissolve the Twin America joint venture.

**ANSWER:**     Twin America admits that it requested reconsideration from the STB on

the denial of its application on February 28, 2011.  Twin America admits that the STB denied its

petition for reconsideration on January 11, 2012, after granting an interim stay to reconsider the

application.  Twin America further admits the STB's January 11, 2012 decision contains the

quotation selectively cited in Paragraph 46.  Twin America admits that Twin America terminated

its interstate charter services, which ended the STB's jurisdiction over the joint venture.  Twin

America denies the remaining allegations in Paragraph 46.


47.     On December 11, 2012, the United States and the State of New York filed a complaint against defendants in the United States District Court for the Southern District of New York alleging violations of Sections 1 and 2 of the Sherman Act and Section 7 of the Clayton Act.

**ANSWER:**     Twin America admits that the United States and the State of New York

have filed a litigation captioned *United States of America, et al. v. Twin America, LLC, et al.*,

No. 12 CV 8989, in the United States District Court for the Southern District of New York

alleging violations of Section 1 of the Sherman Act, Section 7 of the Clayton Act, Section 340 of

the Donnelly Act, and Section 63(12) of the New York Executive Law.  Twin America denies

the remaining allegations in Paragraph 47.


48.     Defendants possess monopoly power in the relevant market.  Twin America currently operates approximately 99 percent of New York City's hop-on, hop-off bus tours.

Defendants control pricing for hop-on, hop-off bus tours in New York City and, accordingly, have monopoly power with respect to such tours. Defendants have demonstrated the ability to sell their services profitably at prices substantially above the competitive level and above marginal costs, without losing significant sales. Defendants' ability to profitably sustain a 10 to 17 percent price increase for over three years is direct evidence of their possession of monopoly power.

**ANSWER:**   Denied.

49.     Defendants willfully acquired monopoly power, and have willfully maintained such power, through illegitimate means. Prior to the formation of Twin America, Coach and City Sights viewed themselves as the only meaningful competitors in the market. They aggressively monitored and responded to changes in each other's prices and services, but did not similarly track and respond to the prices and service offerings of other types of tours. In numerous internal ordinary course-of-business documents and in statements filed in court, City Sights and Coach each identified the other as its "sole" or "main" competitor. City Sights even threatened to sue Coach for monopolization and other antitrust law violations based on a relevant market defined as "Double Decker, Hop-on, Hop-off Bus Tours" and identified City Sights and Coach as the only competitors in that relevant market.

**ANSWER:**   Twin America admits that certain documents contain the words selectively quoted in Paragraph 49 out of context and that CitySights threatened to sue Coach. Twin America denies the remaining allegations in Paragraph 49.

50.     The market for hop-on, hop-off bus tours in New York City is highly concentrated and has become even more concentrated as a result of Defendants' joint venture. The combination of the Coach and City Sights operations into Twin America has created a new entity with monopoly power, owning over 120 double-decker buses and controlling approximately 99 percent of the relevant market. This market concentration creates a presumption that the joint venture substantially lessens competition.

**ANSWER:**   Denied.

51.     As articulated in the Horizontal Merger Guidelines issued by the Department of Justice and the Federal Trade Commission ("Guidelines"), the Herfindahl-Hirschman Index ("HHI") is a measure of market concentration.[1] Market concentration is often one useful indicator of the likely competitive effects of a merger. The more concentrated a market, and the more that a transaction would increase concentration in a market, the more likely it is that a transaction would result in harm to consumers. The Guidelines deem a market in which the HHI

is above 2,500 points to be highly concentrated.  Transactions that increase the HHI by more than 200 points in highly concentrated markets will be presumed likely to enhance market power.

FN1: *See* U.S. Dep't of Justice and Federal Trade Commission, Horizontal Merger Guidelines § 5.3 (2010), available at http://www.justice.gov/atr/public/guidelines/hmg-2010.html.  The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers.  For example, for a market consisting of four firms with shares of 30, 30, 20, and 20 percent, the HHI is 2,600 ($30^2 + 30^2 + 20^2 + 20^2 = 2,600$).  The HHI takes into account the relative size distribution of the firms in a market.  It approaches zero when a market is occupied by a large number of firms of relatively equal size and reaches its maximum of 10,000 points when a market is controlled by a single firm.  The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

**ANSWER:**   Twin America admits the Horizontal Merger Guidelines issued by the

United States of America refer to the Herfindahl-Hirschman Index as one means to measure

market concentration.  Twin America denies the remaining allegations in Paragraph 51.

52.     In the year prior to Twin America's formation in March 2009, according to Coach's estimates, Coach held a market share of approximately 65 percent and City Sights held a share of approximately 34 percent.  Big Taxi Tours held no more than a 1 percent share.  Prior to the joint venture, the HHI for the New York City hop-on, hop-off bus tour market exceeded 5,000.  The formation of Twin America increased the market's HHI to approximately 9,800.  The increase in HHI of over 4,000 points resulting from the joint venture is far greater than the 200 point change that renders a transaction presumptively anticompetitive under the Guidelines.

**ANSWER:**   Denied.

53.     The formation of Twin America eliminated head-to-head competition between Coach and City Sights.  As discussed above, because each company closely monitored the other's services and battled for market share, the competition between Coach and City Sights provided tangible benefits for consumers with respect to prices and new product offerings.  The elimination of this competition increased the likelihood that City Sights and Coach would raise prices and refrain from improving their service offerings.

**ANSWER:**   Denied.

54.     In addition to these likely anticompetitive effects, the formation of Twin America has resulted in actual anticompetitive effects.  Consistent with months of internal transaction-related documents outlining plans for a 10 percent fare increase in connection with the joint venture, both Coach and City Sights increased base fares by $5 (approximately 10 percent) in early 2009.

**ANSWER:**     Denied.

55.     In the nearly four years of Twin America's operation, neither entry nor expansion of the hop-on, hop-off bus tour market has taken place to an extent that would sufficiently replace the competition lost by the combination of City Sights and Coach.

**ANSWER:**     Denied.  Twin America avers that, at the time of the merger, the economy was facing a historic recession, which had a major impact on tourism in New York City.  The rebounding tourism economy has brought with it even more competitors, including more providers of double-decker hop-on/hop-off bus tours.

Go New York Tours ("Go New York"), started by Bike Rental Central Park, a bike tour company, began operating in 2012.  Go New York initially began running ad-wrapped buses without passengers on routes throughout the City to generate revenue.  In August 2012, Go New York began serving both Upper and Lower Manhattan with a full suite of bus stops at all the major New York City attractions.

New York Water Taxi ("NYWT") has been operating hop-on/hop-off water tours since 2002.  In July 2012, NYWT added a hop-on/hop-off double-decker bus tour, linking its existing hop-on/hop-off water service to Midtown Manhattan attractions, providing a 90-minute guided bus tour with four hop-on/hop-off stops around Midtown (the Empire State Building, Rockefeller Center, Times Square North, and Times Square South), terminating at NYWT's Pier 84.  The double-decker bus tour is included in the purchase of any NYWT boat ticket, permitting a customer to see (and hop off at) New York's primary attractions from both its water stops around Manhattan and now across Midtown via double-decker bus.

27

In addition to Go New York and NYWT, two longstanding New York tourism companies have announced plans to begin hop-on/hop-off bus tours this year.  Skyline Sightseeing, affiliated with the well-known NY SKYRIDE virtual sightseeing tour, is now marketing and selling its newly announced double-decker sightseeing bus tour service to the world travel trade.  Upon information and belief, Skyline has taken significant steps towards commencing operations, including obtaining authorization from the NYCDOT for at least eighteen bus stops covering all major New York City attractions; obtaining a sightseeing license from the New York City Department of Consumer Affairs; purchasing a fleet of double-decker buses; partnering with a wrap advertiser; developing and printing sales brochures; and recruiting bus drivers, ticket sellers, and operations personnel.

And Circle Line, the iconic brand that has operated sightseeing cruises in New York City since 1945, has announced and started operating bus tours under the name "Metro Sightseeing."

56.     Significant barriers exist to new entry.  In order to commence operations, an entrant must obtain approval from NYCDOT to pick up and drop off passengers at specified bus stops along its proposed tour route.  Defendants obtained bus stop authorizations on a "first come, first served" basis several years ago and secured stopping rights directly in front of New York City's major tourist attractions.  Due in part to congestion and other traffic issues that have intensified in recent years, however, the majority of bus stops at major tourist destinations that have been requested by potential entrants have been denied, including stops at top attractions such as the Empire State Building, Times Square, Macy's, the World Trade Center site, and Battery Park.  Moreover, where potential entrants have received stopping rights within the vicinity of a key attraction, the stop has typically been located multiple blocks away.  Without the ability to stop (and enable passengers to hop on and hop off) at a critical mass of top tourist attractions and neighborhoods, a would-be entrant cannot offer a hop-on, hop-off service that meaningfully competes with Twin America's hop-on, hop-off bus tours.

**ANSWER:**     Denied.  Twin America further incorporates its averments in Paragraph 55 as though fully set forth herein.  Twin America further avers that other tour operators have obtained bus stops that are around the same proximity to attractions as existing Twin America bus stops.

57.     Even if a company were to overcome this obstacle and commence operations, it would need to obtain and deploy a large fleet of buses and operate service at a high frequency in order to offer wait times similar to Twin America's.  Without a large fleet of buses to offer comparable wait times to Twin America's, a would-be entrant cannot provide a hop-on, hop-off service that meaningfully competes with Twin America.  These measures take time and are costly to implement.

**ANSWER:**     Denied.  Twin America expressly avers that CitySights' entry and growth from 2005 to 2009 demonstrate that any new bus tour operator can effectively and efficiently enter the market and scale its fleet and operations commensurate with its ridership.

58.     Brand recognition is another important part of providing a hop-on, hop-off bus tour business that would be able to effectively compete against Twin America.  A lack of brand recognition creates difficulties in establishing multiple distribution channels, selling advance tickets to international customers, and obtaining cross-marketing partnerships.  As Coach itself recognized, "market entry requires the establishment of strong brands and critical mass."  More than three years have passed since the formation of Twin America without any company surmounting these barriers.

**ANSWER:**     To the extent the allegations in Paragraph 58 are directed to another defendant, Twin America lacks knowledge or information sufficient to form a belief as to the truth of those allegations and on this basis denies those allegations.  Twin America denies the remaining allegations in Paragraph 58, and further incorporates its averments in Paragraph 55 as though fully set forth herein.

59.     Expansion by Big Taxi has been minimal and not nearly on a scale sufficient to reverse the Transaction's anticompetitive effects.  Although it was established in 1999, Big Taxi operates today with approximately six buses, rendering it unable to offer hop-on, hop-off bus service at a frequency remotely comparable to or competitive with those offered by Twin America.  Whereas Twin America operates dozens of buses that pick up customers along the company's tour routes multiple times per hour, Big Taxi operates its primary loop with only three buses on an average day, causing extended wait times for customers attempting to hop off and hop back on.  Indeed, Big Taxi was not able to discipline Defendants' early 2009 price increase, and has not replaced the competition lost due to the formation of Twin America.

**ANSWER:**    Twin America admits that Big Taxi has operated hop-on/hop-off buses in

New York City since 1999.  Twin America denies the remaining allegations in Paragraph 59.

 60.    In the summer of 2012, a small company named Go New York Tours began
operating approximately five hop-on, hop-off buses in New York City.  Like Big Taxi Tours, Go
New York's bus fleet is not large enough to offer hop-on, hop-off service at a frequency that
competes meaningfully with Twin America's.  Moreover, the company has been unable to obtain
from NYCDOT the critical mass of bus stop authorizations at top New York City attractions and
neighborhoods needed to rival Twin America's tour offerings.

**ANSWER:**    Twin America admits that Go New York began operating hop-on/hop-off

buses in New York City in 2012.  Twin America incorporates by reference its response to

Paragraph 55 as though fully set forth herein.  Twin America denies the remaining allegations in

Paragraph 60.

 61.    Another New York City tourism company, Skyline Multimedia Entertainment,
Inc., is contemplating entering the hop-on, hop-off bus tour market.  Skyline currently operates a
virtual tour simulator, narrated by Kevin Bacon, located inside the Empire State Building.
However, Skyline has no prior experience operating hop-on, hop-off bus tours--nor bus tours of
any kind for that matter--and its plans to compete with Twin America are not yet definitive.

**ANSWER:**    Twin America avers that on information and belief Skyline intends to

operate a hop-on/hop-off bus tour in New York City.  Twin America incorporates by reference

its response to Paragraph 55 as though fully set forth herein.  Twin America denies the remaining

allegations in Paragraph 61.

 62.    Defendants cannot demonstrate cognizable and merger-specific efficiencies that
are or would be sufficient to offset Twin America's anticompetitive effects.

**ANSWER:**    Denied.

63.     Plaintiff brings this lawsuit on behalf of herself and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons who, or entities that, directly purchased "hop-on, hop-off" bus tours from defendants from March 17, 2009, until the effects of defendants' anticompetitive conduct cease (the "Class Period"). Excluded from the Class are defendants, their present and former parents, subsidiaries, affiliates, and employees.

**ANSWER:**     Twin America admits that Plaintiff purports to bring this action as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and seeks to certify a class action under federal antitrust laws.  Twin America denies the remaining allegations in Paragraph 63.  Twin America specifically denies that any factual or legal basis exists for certification of a class action.

64.     Plaintiff does not know the exact number of Class members because such information is in the control of defendants, but based upon the nature of the trade and commerce involved, plaintiff believes the Class numbers in the thousands.

**ANSWER:**     Denied.

65.     The Class is so numerous that joinder of all members is impracticable.

**ANSWER:**     Denied.

66.     There are numerous questions of law and fact common to the Class, including most importantly whether defendants' conduct is price-fixing in violation of the Sherman Act.

**ANSWER:**     Denied.

67.     In addition, the following questions of law and fact are common to the Class
(a) the definition of the relevant market;
(b) whether defendants' joint venture had any legitimate business purpose beyond enabling defendants to fix prices above the market rate;
(c) whether defendants possess monopoly power;

(d) whether defendants willfully acquired and/or maintained that monopoly power through illegitimate means; and

(e) whether the effect of defendants' merger transaction has been to substantially lessen competition and to create a monopoly.

**ANSWER:**   Denied.

68.    Plaintiff's claims seeking overcharge damages as a direct purchaser of hop-on, hop-off bus tours are typical of the claims of Class members.

**ANSWER:**   Denied.

69.    Plaintiff is represented by experienced antitrust counsel and will fairly and adequately protect the interest of the Class.

**ANSWER:**   Twin America lacks knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 69 and on this basis denies those allegations.

70.    The above-described questions of law and fact common to the Class predominate over any questions affecting only individual members.

**ANSWER:**   Denied.

71.    A class action is superior to other methods for the fair and efficient adjudication of this controversy.  There are no significant difficulties involved with managing a direct purchaser class action seeking overcharge damages for defendants' antitrust violations.  A class action will permit a large number of similarly situated persons to adjudicate common claims simultaneously, efficiently, and without the duplication of effort or expense that numerous individual actions would engender.  Moreover, the United States District Court for the Southern District of New York is a desirable forum for adjudicating common claims arising from defendants' conduct largely within the district.

**ANSWER:**   Denied.

72.    On behalf of herself and the Class, plaintiff realleges and incorporates all of the preceding paragraphs as if set forth fully herein.

**ANSWER:**    Twin America realleges and incorporates by reference its response to all of the preceding paragraphs as though fully set forth herein.

73.    As direct purchasers of hop-on, hop-off bus tour tickets from defendants at artificially inflated prices, plaintiff and the other Class members have suffered antitrust injuries and have standing to pursue all of the federal and state law antitrust claims set forth below.

**ANSWER:**    Denied.

74.    Plaintiff realleges and incorporates the preceding paragraphs as if set forth fully herein.

**ANSWER:**    Twin America realleges and incorporates by reference its response to the preceding paragraphs as though fully set forth herein.

75.    Coach's and City Sights's agreement to combine their hop-on, hop-off bus tour assets and operations through the Transaction, to eliminate competition between them, and to not compete against each other or against Twin America unreasonably restrains trade, and will likely continue to unreasonably restrain trade, in the market for hop-on, hop-off bus tours in New York City, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  The Transaction has and will likely continue to have the effects alleged above.

**ANSWER:**    Denied.

76.    Plaintiff realleges and incorporates the preceding paragraphs as if set forth fully herein.

**ANSWER:**    Twin America realleges and incorporates by reference its response to the preceding paragraphs as though fully set forth herein.

77.    Defendants monopolized the market for hop-on, hop-off bus tours in New York City in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

**ANSWER:**    Denied.

78.    Defendants, by and through their officers, directors, employees, agents, and/or other representatives, engaged in anticompetitive exclusionary conduct, as set forth above, that was intended to and did have the effect of illegally establishing and maintaining Twin America's monopoly in the New York City hop-on, hop-off bus-tour market.

   **ANSWER:**    Denied.


79.    Defendants have effectively excluded competition from a significant and substantial portion of the New York City market, unlawfully expanded and maintained their combined market share, and profited from their anticompetitive conduct by setting and maintaining prices at artificially high levels and by otherwise reaping the benefits of their illegally obtained and maintained monopoly power.

   **ANSWER:**    Denied.


80.    There is no legitimate business justification for defendants' anticompetitive actions and conduct through which they established, expanded, and maintained their monopoly power in the New York City hop-on, hop-off bus-tour market.

   **ANSWER:**    Denied.


81.    Plaintiff realleges and incorporates the preceding paragraphs as if set forth fully herein.

   **ANSWER:**    Twin America realleges and incorporates by reference its response to the

preceding paragraphs as though fully set forth herein.


82.    By entering into the Transaction identified above, defendants formed and continue to operate the Twin America joint venture, the effect of which has been and will likely continue to be to substantially lessen competition and to tend to create a monopoly in the market for hop-on, hop-off bus tours in New York City, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

   **ANSWER:**    Denied.

83.     Through Coach and City Sights contributing their New York City hop-on, hop-off bus tour operations and assets to the joint venture and acquiring an interest in Twin America, the Transaction has had, and will likely continue to have, the following effects, among others:

(a)     competition between Coach and City Sights in the provision of hop-on, hop-off bus tours in New York City was, is, and will continue to be eliminated;

(b)     competition generally in the provision of hop-on, hop-off bus tours in New York City was, is, and will continue to be substantially lessened;

(c)     the prices of hop-on, hop-off bus tours in New York City did and will likely continue to increase to levels above those that would have prevailed absent the Transaction; and

(d)     consumers were, are, and will continue to be deprived of benefits and features that would have existed but for the Transaction.

**ANSWER:**   Denied.

84.     On behalf of herself and the Class, plaintiff realleges and incorporates the preceding paragraphs as if set forth fully herein.

**ANSWER:**   Twin America realleges and incorporates by reference its response to the preceding paragraphs as though fully set forth herein.

85.     Through the misconduct described above, defendants also violated the Donnelly Act, N.Y. Gen. Bus. Law § 340.

**ANSWER:**   Denied.

86.     For the reasons set forth above, plaintiff requests:

(a)     that the Court determine that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23, be given to the Class;

(b)     that the Court adjudge defendants' conduct to violate Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1,2; Section 7 of the Clayton Act, 15 U.S.C. § 18; and the Donnelly Act, N.Y. Gen. Bus. Law § 340;

(c)     that judgment be entered for plaintiff and members of the Class for three times the amount of damages sustained as allowed by law, together with the costs of this action, including reasonable attorneys' fees;

(d)     that plaintiff and the Class be awarded pre-judgment and post-judgment interest at the highest legal rate from the earliest date allowable to the extent provided by law; and

(e)     that plaintiff and the Class have such other, further or different relief as the case may require and the Court may deem just and proper under the circumstances.

## RESPONSE TO PLAINTIFF'S PRAYER FOR RELIEF

Twin America denies that the Twin America joint venture has violated the law and that Plaintiff is entitled to any of the relief, legal or equitable, sought.  Twin America further denies, generally and specifically, that the elements of relief sought are available to Plaintiff on the claims alleged.

## AFFIRMATIVE AND ADDITIONAL DEFENSES

As additional defenses to the Complaint, Twin America states, without assuming any burden of pleading or proof that would otherwise rest on Plaintiff, as follows:

### FIRST DEFENSE
(Failure to State a Claim)

1.     The Complaint fails to state a claim upon which relief can be granted.

### SECOND DEFENSE
(State Action Doctrine)

2.     The claims set forth in the Complaint are barred by the State Action Doctrine.

### THIRD DEFENSE
(Lack of Standing)

3.     Plaintiff lacks standing to assert claims against Defendants.

### FOURTH DEFENSE
(Mootness)

4.     Plaintiff's claims should be dismissed to the extent they are moot.

### FIFTH DEFENSE
(Improper Antitrust Market)

5.     The purported relevant market alleged in the Complaint is not a relevant antitrust market, and Plaintiff cannot carry their burden of defining a proper relevant market.

**SIXTH DEFENSE**
(Lack of Market or Monopoly Power)

6.      Defendants do not have market power or monopoly power in any properly defined

relevant market, and Plaintiff therefore cannot state a claim sounding in antitrust.

**SEVENTH DEFENSE**
(Lack of Barriers to Entry)

7.      Defendants would not have market power even if the relevant market were as

alleged in the Complaint because of the lack of significant barriers to entry.

**EIGHTH DEFENSE**
(Lack of Anticompetitive Conduct)

8.      Any conduct engaged in by Defendants was not anticompetitive and cannot support

a claim sounding in antitrust.

**NINTH DEFENSE**
(Lack of Illegal Activity)

9.      Plaintiff's claims are barred, in whole or in part, because Defendants did not

engage in any illegal activity.

**TENTH DEFENSE**
(Lack of Supracompetitive Pricing)

10.      Plaintiff's claims are barred, in whole or in part, because Defendants did not

engage in supracompetitive pricing.

**ELEVENTH DEFENSE**
(Conduct Did Not Lessen Competition)

11.      Plaintiff's claims are barred, in whole or in part, because the alleged conduct that is

the subject of the Complaint did not lessen competition in a relevant market or markets.

**TWELFTH DEFENSE**
(No Injury-in-Fact or Antitrust Injury)

12.      Plaintiff's claims are barred, in whole or in part, because Plaintiff has not suffered

an injury-in-fact or antitrust injury traceable to allegedly unlawful conduct of Defendants.

### THIRTEENTH DEFENSE
(Damages too Remote/Uncertain)

13.   Plaintiff is not entitled to damages because any damages that Plaintiff alleges to have suffered are too remote, speculative, and/or uncertain to allow for a recovery. Such damages are not capable of ascertainment and allocation.

### FOURTEENTH DEFENSE
(Not a Proper Class Action)

14.   Plaintiff's action is not a proper class action because Plaintiff's claims are not typical of those of the putative class; common questions do not predominate; Plaintiff and Plaintiff's counsel are not adequate representatives of the putative class; damages cannot be proven on a class-wide basis; and a class action is not a superior method of adjudication of this case.

### FIFTEENTH DEFENSE
(Laches/Timeliness)

15.   Plaintiff's claims are barred by the doctrine of laches and/or any applicable statutes of limitation.

### SIXTEENTH DEFENSE
(No Entitlement to Attorneys' Fees)

16.   Plaintiff is not entitled to receive reasonable attorneys' fees.

### SEVENTEENTH DEFENSE
(Incorporation of Defenses of Others)

17.   Twin America adopts by reference any applicable defense pleaded by any other Defendant not otherwise expressly set forth herein.

### EIGHTEENTH DEFENSE
(Reservation of Other Defenses)

18.   Twin America reserves the right to assert other defenses as this action proceeds

up to and including the time of trial.

Dated:  May 17, 2013                              Respectfully submitted,


  /s/  Michael P. A. Cohen         

Michael P. A. Cohen (admitted *pro hac vice*)
PAUL HASTINGS LLP
875 15th Street, N.W.
Washington, DC 20005
Telephone:  (202) 551-1880
Facsimile:  (202) 551-0280
michaelcohen@paulhastings.com

*Attorneys for Defendants Twin America, LLC,*
*CitySights, LLC, and City Sights Twin, LLC*